UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| **UNITED STATES OF AMERICA**<br><br>    v.<br><br>**Joshua SUAREZ** | Crim. No. 20-195 (KM)<br><br>**OPINION & ORDER** |

**MCNULTY, District Judge**

The defendant, Joshua Suarez, is serving a 72-month sentence for conspiracy to commit wire fraud. He seeks compassionate release pursuant to the First Step Act. For the reasons stated herein, the motion is denied.

**I.    BACKGROUND**

Mr. Suarez pled guilty to a one-count information charging him with conspiracy to commit wire fraud, contrary to 18 U.S.C. § 1343, in violation of 18 U.S.C. § 1349. He supervised a scheme to obtain money from financial institutions by assuming the identities of the fraud victims. This Court sentenced Mr. Suarez to 72 months' imprisonment and ordered him to pay $500,000 in restitution.

Mr. Suarez is incarcerated at FCI Schuylkill. He has served approximately 33 months of his sentence. His estimated release date, assuming continued accumulation of good time credit, is July 13, 2024. *See* Federal inmate locator, https://www.bop.gov/inmateloc/ (inmate # 72558-050).

Although it initially contested the issue, the government now concedes (*see* DE 37) that Mr. Suarez has fulfilled the prerequisite of exhaustion of BOP remedies. 18 U.S.C. § 3582(c)(1)(A); *United States v. Raia,* 954 F.3d 594, 597 (3d Cir. 2020).

Now before the Court is Mr. Suarez's motion for compassionate release pursuant to the First Step Act, 18 U.S.C. § 3582(c)(1)(A) (DE 33). The government has filed a responding brief (DE 35), attaching prison medical and other records as exhibits (DE 35-2). Other miscellaneous filings relevant to the motion are at DE 34 (gov't letter), DE 36 (Suarez reply), DE 38 (Suarez further reply).

## II. MOTION FOR COMPASSIONATE RELEASE

### a. Legal Standards

Once a term of imprisonment has been imposed, the Court may modify it only under very limited circumstances. *In re Morris*, 345 F. App'x 796, 797–98 (3d Cir. 2009) (citing 18 U.S.C. § 3582(c)). As relevant here, § 3582(c)(1) provides as follows:

> (A) the court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that--
>
> > (i) extraordinary and compelling reasons warrant such a reduction; [. . .]
>
> and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission . . . .

*See also United States v. Pawlowski*, 967 F.3d 327, 329–30 (3d Cir. 2020). The United States Sentencing Commission has promulgated a policy statement that, in relevant part, allows a court to grant compassionate release or a

2

sentence reduction where: (i) extraordinary and compelling reasons warrant a reduction in a defendant's sentence; (ii) the defendant is not a danger to the safety of others or to the community; and (iii) release from custody complies with the section 3553(a) factors, to the extent applicable. U.S. SENTENCING GUIDELINES MANUAL ("U.S.S.G.") § 1B1.13 (U.S. SENTENCING COMM'N 2018).

The Sentencing Commission issued a policy statement defining certain circumstances that qualify as extraordinary and compelling. U.S.S.G. § 1B1.13, Application Note 1(A)–(D).[1] That policy statement was enacted at a time when only the BOP could move for compassionate release, however, and has not been amended since the enactment of the First Step Act. In prior cases, I accepted the emerging near-consensus that where a defendant makes a motion under the First Step Act, the court is not bound by that application note. The U.S. Court of Appeals for the Third Circuit, in a precedential decision, has now joined that consensus:

> The first issue is whether the District Court was bound by the Commission's policy statement. We conclude that it was not.
>
> As the District Court noted, the text of the policy statement explicitly limits its application to Bureau-initiated motions. Thus, according to its plain language, the existing policy statement is not applicable—and not binding—for courts considering prisoner-initiated motions. In reaching this conclusion, we align with nearly every circuit court to consider the issue. *See United States v.*

---

[1] The application note lists three specific circumstances that qualify as extraordinary and compelling. Generally speaking, the enumerated circumstances include: (i) a terminal illness or a serious medical condition that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover; (ii) the defendant is at least 65 years old, is experiencing a serious deterioration in physical or mental health because of the aging process, and has served at least 10 years or 75 percent of his or her term of imprisonment, whichever is less; or (iii) certain family circumstances exist where the defendant would be the only available caregiver for his or her minor child, spouse, or registered partner. U.S.S.G. § 1B1.13, Application Note 1(A)–(C). In addition, the Sentencing Commission included a catchall provision, which provides that "other reasons" may be sufficient if "[a]s determined by the Director of the [BOP], there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in [the enumerated] subdivisions." *Id.*, Application Note 1(D).

3

> *Brooker*, 976 F.3d 228, 235 (2d Cir. 2020); *United States v. McCoy*, 981 F.3d 271, 282 (4th Cir. 2020); *United States v. Shkambi*, 993 F.3d 388, 393 (5th Cir. 2021); *United States v. Elias*, 984 F.3d 516, 519–20 (6th Cir. 2021); *United States v. Gunn*, 980 F.3d 1178, 1180–81 (7th Cir. 2020); *United States v. Aruda*, 993 F.3d 797, 802 (9th Cir. 2021); *United States v. McGee*, 992 F.3d 1035, 1050 (10th Cir. 2021); *United States v. Long*, 997 F.3d 342, 355 (D.C. Cir. 2021). *But see United States v. Bryant*, 996 F.3d 1243, 1247–48 (11th Cir. 2021).

*United States v. Andrews*, 12 F.4th 255, 259 (3d Cir. 2021).

Thus the Guidelines policy statement does not limit what this Court, within its reasonable discretion, may find to be "extraordinary and compelling." Still, it remains a relevant and valuable guide, and is properly considered by a district court:

> The [district] court correctly recognized that although the policy statement is no longer binding, it still sheds light on the meaning of extraordinary and compelling reasons. "It is a commonplace of statutory interpretation that 'Congress legislates against the backdrop of existing law.'" *Parker Drilling Mgmt. Servs., Ltd. v. Newton*, ––– U.S. ––––, 139 S. Ct. 1881, 1890, 204 L.Ed.2d 165 (2019) (quoting *McQuiggin v. Perkins*, 569 U.S. 383, 398 n.3, 133 S.Ct. 1924, 185 L.Ed.2d 1019 (2013)). Because Congress reenacted the compassionate-release statute without any alterations to the phrase "extraordinary and compelling reasons," it was reasonable for the court to conclude that the phrase largely retained the meaning it had under the previous version of the statute. *See United States v. Johnman*, 948 F.3d 612, 619 (3d Cir. 2020) . . . .

*Andrews*, 12 F.4th at 260.

I therefore consider the grounds asserted by the defendant, whether or not specifically authorized by the Guideline policy statement. In particular, I consider whether the grounds cited here rise to the level of extraordinary and compelling circumstances, and, if so, whether the purposes of sentencing would nevertheless be unduly undermined if defendant were released.

### b. Extraordinary and compelling circumstances

Mr. Suarez's First Step Act application for reduction of sentence rests

4

primarily on the danger to his health from a COVID-19 infection while in the institutional setting of FCI Schuylkill. My review of the submissions and the records supplied to the Court yields the conclusion that there are no extraordinary and compelling medical circumstances here.

Mr. Suarez is approximately 36 years old. He cites asthma as the basis for a finding that his medical circumstances are extraordinary and compelling. He has refused to be vaccinated against COVID-19. Logically, any assessment of extraordinary circumstances arising from the COVID-19 pandemic must consider first, the likelihood that a COVID infection would have severe consequences for this particular person, and second, the more general danger of infection at the institution where the person is incarcerated.

> 1. *Asthma as risk factor*

Courts, including this one, have routinely looked to the Centers for Disease Control ("CDC") for guidance as to conditions that place a person at particular risk of serious consequences from a COVID-19 infection. *See People With Certain Medical Conditions*, Centers for Disease Control, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (updated as of Dec. 14, 2021) (cited herein as "CDC List"). "Older adults," *i.e.,* those over age 65, are far more likely than young persons to suffer serious consequences, and account for some 80% of COVID deaths. *Id.* Certain listed medical conditions are also recognized as risk factors. These include "Asthma, if it's moderate to severe." *Id.*[2]

Mr. Suarez, aged 36, is not an "older adult," and will not be one at the time of his presumptive release date. He cites his asthma, and, as noted, the CDC does list "moderate to severe" asthma as a risk factor.

---

[2] The more complete list, in abbreviated form, consists of Cancer, Chronic kidney disease, Chronic liver disease, Chronic lung disease (including "Asthma, if it's moderate to severe"), Dementia, Diabetes, Down syndrome, Heart conditions (and "possibly high blood pressure (hypertension)"), HIV infection, Immunocompromised state, Mental health conditions, Overweight and obesity, Pregnancy, Sickle cell disease, Smoking, Solid organ or blood stem cell transplant, Stroke, Substance use disorders, and Tuberculosis. *Id.*

The government concedes, and prison medical records confirm, Mr. Suarez's diagnosis of "moderate persistent asthma."[3] BOP medical records (DE 35-2) reveal that Mr. Suarez's asthma has been monitored regularly and treated appropriately. It appears to be well-controlled, with medication provided by the institution. He is prescribed a steroid inhaler for everyday use and a rescue inhaler to be used as needed. (DE 35-2 at 1) Mr. Suarez reported to BOP Health Services that he used his steroid inhaler daily; that he uses his rescue inhaler once a day (it is prescribed for up to four times daily); and that he has no additional complaints. A recent exam further found "70% compliance with inhaler use." (*Id.* at 2). The defendant is fully ambulatory and the records show no significant restrictions in performing all normal activities of daily living.

Even in the pre-vaccination era, release was regularly denied based on such chronic, controlled conditions, which are not out of the ordinary. *See United States v. Coleman*, 848 F. App'x 65, 66 (3d Cir. 2021) (upholding denial of release to inmate with "well managed" conditions of "asthma (moderate-severe), HIV, and hypertension"); *United States v. Pawlowski*, 967 F.3d 327, 330 (3d Cir. 2020) (in pre-vaccine era, denying compassionate release application of inmate who had hypertensive heart disease, COPD, sleep apnea, and only one lung); *United States v. Scalea*, No. 18- 00620, 2021 WL 395874, at *2 (D.N.J. Feb. 4, 2021) (denying compassionate release to an inmate with asthma and hypertension because he did not "fall within the class of people

---

[3] **Moderate persistent asthma**

Asthma is considered moderate persistent if without treatment **any** of the following are true:

- Symptoms occur daily. Inhaled short-acting asthma medication is used every day.
- Symptoms interfere with daily activities.
- Nighttime symptoms occur more than 1 time a week, but do not happen every day.
- Lung function tests are abnormal (more than 60% to less than 80% of the expected value), and PEF varies more than 30% from morning to afternoon.

https://www.uofmhealth.org/health-library/hw161158 (accessed March 10, 2022).

most vulnerable to the virus"); *United States v. Tull*, No. 15-622, 2020 WL 6381250, at *3 (D.N.J. Oct. 30, 2020) (collecting cases for the proposition that "[m]ultiple decisions in this District have denied compassionate release to inmates suffering from asthma, hypertension, and/or other health issues, despite the risk of COVID-19.").

### *2. Vaccination*

Prison records disclose that Mr. Suarez was offered the opportunity to be vaccinated against COVID-19 vaccine, but declined. He objects that the vaccine is new, and he states that he does not believe it has been approved by the FDA.

The available vaccines (Pfizer, Moderna, and Johnson & Johnson) have been shown to be highly effective at preventing infection and, when breakthrough infections occur, at reducing the severity of symptoms. *See* The Possibility of COVID-19 after Vaccination: Breakthrough Infections, https://www.cdc.gov/coronavirus/2019-ncov/vaccines/effectiveness/why-measure-effectiveness/breakthrough-cases.html; (updated Dec. 17, 2021). The wide availability of vaccines tends to render the COVID-19 risk less extraordinary or compelling. The rates are constantly changing, of course, but the CDC summarize their effectiveness data as follows:

- **People who were unvaccinated had a greater risk of testing positive for COVID-19 and a greater risk of dying from COVID-19 than people who were fully vaccinated** . . . .
- **Unvaccinated people in all age groups had higher case and death rates than fully vaccinated people in the same age groups.**
- **Case and death rates for people fully vaccinated with any of the three vaccine types (Moderna, Pfizer-BioNTech, Johnson & Johnson's Janssen) were much lower than for unvaccinated people.**

https://covid.cdc.gov/covid-data-tracker/#rates-by-vaccine-status

As a proxy for severity, the CDC report the following hospitalization data:

In January [2022], compared to fully vaccinated persons in each group shown below, the monthly rates of COVID-19-associated hospitalizations were:

**7X** Higher in Unvaccinated Adults Ages 18 Years and Older

> **3x** Higher in Unvaccinated Adolescents Ages 12-17 Years
>
> **5x** Higher in Unvaccinated Adults Ages 18-49 years
>
> **7x** Higher in Unvaccinated Adults Ages 50-64 years
>
> **8x** Higher in Unvaccinated Adults Ages 65 Years and Older

https://covid.cdc.gov/covid-data-tracker/#covidnet-hospitalizations-vaccination.

Given the effectiveness of vaccines, I have often found vaccination to be a highly relevant consideration in assessing the risks associated with COVID-19 infection. (A recent example is *United States v. v. Jerez Matos*, No. CR 19-113 (KM), 2022 WL 702858, at *3 (D.N.J. Mar. 9, 2022).) Here, however, we have the opposite: a prisoner who refuses to be vaccinated.

The Seventh Circuit has taken a strong stance on refusal to be vaccinated, treating it as practically a disqualifier in most cases:

> [A] prisoner who remains at elevated risk because he has declined to be vaccinated cannot plausibly characterize that risk as an "extraordinary and compelling" justification for release. The risk is self-incurred. . . . The federal judiciary need not accept a prisoner's self-diagnosed skepticism about the COVID-19 vaccines as an adequate explanation for remaining unvaccinated, when the responsible agencies all deem vaccination safe and effective . . . . A prisoner who can show that he is unable to receive or benefit from a vaccine still may turn to this statute, but, for the vast majority of prisoners, the availability of a vaccine makes it impossible to conclude that the risk of COVID-19 is an "extraordinary and compelling" reason for immediate release.

*United States v. Broadfield*, 5 F.4th 801, 803 (7th Cir. 2021).

One need not fully accept the Seventh Circuit position, however, to find pertinent the observations of the U.S. Court of Appeals for the Third Circuit in a recent unreported case:

> . . . Thomas argues that his request was denied because he received the COVID-19 vaccine and this reasoning, if widely adopted, could perversely encourage inmates to decline the vaccine. We disagree. The District Court appropriately recognized that Thomas's vaccination reduced the health risks he relied on in

>support of his motion. This conclusion does not reward inmates who decline opportunities for vaccination. District courts routinely deny compassionate release to inmates who refuse the COVID-19 vaccine because they have voluntarily failed to mitigate the very health concerns they identify in support of an early release. *See, e.g., United States v. Brinson*, No. CR 19-153 (SDW), 2021 WL 2451970, at *2 (D.N.J. June 16, 2021) (Wigenton, J.) ("[B]ecause Defendant was offered and refused the COVID-19 vaccine, he cannot establish that 'compelling and extraordinary reasons' justify his release." (internal citations omitted)); *United States v. Sawyers*, No. CR 15-00070-RSWL-1, 2021 WL 2581412, at *4 (C.D. Cal. June 22, 2021) ("The glaring consensus among district courts is that refusal of a COVID-19 vaccine subverts a defendant's compassionate release motion."), *appeal dismissed*, No. 21-50157, 2021 WL 6196971 (9th Cir. Oct. 18, 2021).

*United States v. Thomas*, No. 21-1645, 2022 WL 296594, at *2 (3d Cir. Feb. 1, 2022). In line with these *dicta* in *Thomas,* cases in this district denying compassionate relief have routinely taken into account a prisoner's refusal to be vaccinated. *See, e.g., United States v. Manon*, No. CR 16-00460 (SDW), 2022 WL 408958, at *3 (D.N.J. Feb. 10, 2022) ("Despite being offered the COVID-19 vaccine and being "begged" by his medical provider to take the vaccine, Defendant has refused vaccination. . . . Clearly, Defendant is not in a condition 'that substantially diminishes' his ability 'to provide self-care within the environment of a correctional facility', as Defendant has rejected the opportunity for vaccination."); *United States v. Bonilla*, No. 20-0083, 2021 WL 3634181, at *2 (D.N.J. Aug. 17, 2021) (collecting cases holding that an inmate's refusal to be vaccinated in the absence of a legitimate medical reason was fatal to establishing an "extraordinary and compelling" reason for compassionate release).

      A prisoner has the right to refuse vaccination, and such a refusal is not dispositive of the compassionate release application. That said, I am wary of creating a perverse incentive to forgo vaccination. There is, moreover, reason to be skeptical of a prisoner who fails to take routine measures to protect himself against the very COVID-19 infection which—he says—has him in terror of

9

losing his life. To recognize this reality does not, as Mr. Suarez suggests, bespeak "discrimination" (indeed, prisoners are routinely denied compassionate release because they *were* vaccinated.) I give refusal to be vaccinated some weight, however, at least insofar as it is based on nothing but the prisoner's lay medical judgment.

I note separately that vaccination has been widespread at the institution where Mr. Suarez is incarcerated. At FCI Schuylkill, BOP reports, there have been 169 full vaccinations of staff, and 1069 full vaccinations of inmates.[4] https://www.bop.gov/coronavirus/. The resulting herd immunity tends to reduce further the risk of infection at Schuylkill.[5]

Mr. Suarez's asthma, although certainly real, is well controlled; even considered in isolation, it does not present extraordinary medical circumstances. To that is added his refusal to be vaccinated, which undermines his claim of fear of serious or fatal consequences from a COVID-19 infection. And widespread vaccination within the institution further reduces the risk to Mr. Suarez.

### 3. *Infection rates at FCI Schuylkill*

I move on to consider the likelihood of contracting COVID-19 at FCI Schuylkill. The pandemic caught the prison system, as it caught society, on the back foot, and it took some time to bring cases under control. The prison system instituted extraordinary containment measures, which had good effect. https://www.bop.gov/coronavirus/covid19_modified_operations_guide.jsp In early to mid-2021, of course, the prison system finally turned the corner as vaccines became available.

FCI Schuylkill is a medium-security institution that houses

---

[4] FCI Schuylkill houses 1062 inmates. Percentages of vaccinated inmates cannot be calculated accurately from these figures, which are cumulative and therefore would not appear to account for turnover in the prison population.

[5] Viewed from one perspective, Mr. Suarez has the luxury of declining vaccination because his fellow inmates have been vaccinated, thus reducing the risk to himself— the classic "free rider" scenario which, if not discouraged, would depress vaccination rates and increase the danger of infection for all.

approximately 1062 inmates, including 94 at an adjacent camp facility. https://www.bop.gov/locations/institutions/sch/. Current and cumulative figures for COVID-19 infections are as follows:

| Inmates Positive | Staff Positive | Inmate Deaths | Staff Deaths | Inmates Recovered | Staff Recovered |
|---|---|---|---|---|---|
| 9 | 3 | 0 | 0 | 524 | 73 |

https://www.bop.gov/coronavirus/

To be sure, the "recovered" figures reveal that over the past two years there were large numbers of positive COVID test results among the inmates and staff. Fortunately, no deaths resulted. Cases appear to have declined steeply, in keeping with general trends. Currently, the facility reports 9 positive test results among inmates—not zero, but not alarming high or dramatically out of line with rates in the larger community. Overall, the figures bespeak some risk, but not too severe a risk, of infection.[6]

Mr. Suarez's personal medical situation, in the context of conditions at FCI Schuylkill, does not support a finding of compelling and exceptional circumstances.[7]

### c. § 3553(a) factors

Even if the circumstances were extraordinary, consideration of the

---

[6] Presumably, the more recent positive cases result from the less severe, but more transmissible, omicron variant of the virus, which peaked in January and has declined since then. https://www.cdc.gov/coronavirus/2019-ncov/covid-data/covidview/index.html

[7] Mr. Suarez adds that his mother, who is "in and out" of hospitals, "could use" his assistance in caring for his autistic brother, and expresses "fear" for his daughter, who suffers from asthma. (DE 33 at 2) These factors were found insufficient to support a variance at sentencing, and still do not strike the court as extraordinary and compelling. He states that his mother's health is now "deteriorating." This falls far short of any showing that, for example, this family member is disabled and has no other personal or institutional caregiver resources available. These facts do not approach those cited in the Guideline commentary, which although not binding, serves as a guide. U.S.S.G. § 1B1.13, Application Note 1(A)–(C) ("(iii) certain family circumstances exist where the defendant would be the only available caregiver for his or her minor child, spouse, or registered partner.") *See also* pp. 3–4 & n.1, *supra*. It is unfortunately common, and not extraordinary, for family members to suffer as a result of a defendant's crimes.

11

factors under 18 U.S.C. § 3553(a) would weigh against an order of release. I have considered those factors, though I discuss them only briefly in light of the analysis above.

The offense is not violent or drug-related, but it is quite serious. Mr. Suarez was an organizer who recruited others whom he exploited in a conspiracy to defraud financial institutions by stealing the identities of depositors. Suarez retained the majority of the illicit proceeds. The loss was over $500,000, and the intended loss over $1.5 million.

The goals of punishment, deterrence, and protection of the public remain paramount. No extended comment on the prevalence of identity theft, the harm to victims and financial institutions, and the need to deter such economically motivated offenses is required.

Mr. Suarez points to his clean disciplinary record in prison, his family connections, and other positive aspects of his character, many of which were noted at the time of sentencing. He opines that the goals of sentencing have now been satisfied. I disagree. Thus far, Suarez has served 33 months half of the 72-month sentence that I imposed.[8] Release at the present time would severely compromise the legitimate goals of sentencing.

Even if Mr. Suarez's circumstances were extraordinary and compelling, which I do not find to be the case, compassionate release would be denied because it would not be consistent with the purposes of sentencing as set forth in 18 U.S.C. § 3553(a).[9]

---

[8]     With the continued accumulation of good time credit, Mr. Suarez will not serve the full 72 months. His current estimated release date, as noted above, is July 13, 2024.

[9]     At times, Mr. Suarez argues for transfer to home confinement. That application must be denied. The Court has no authority to grant such relief, which is reserved to the BOP under 18 U.S.C. § 3624(c)(2). *See United States v. Voda*, 994 F.2d 149, 151–52 (5th Cir. 1993); *Aigebkaen v. Warden*, No. 20-5732, 2020 WL 6883438, at *4 (D.N.J. Nov. 24, 2020) ("Pre-release placement decisions, such as transfers to home confinement, are committed to the BOP's sole discretion."). And if the court did possess the discretion to award such relief, it would not do so, for the reasons expressed above.

## **ORDER**

**IT IS THEREFORE** this 22d day of March, 2022,

**ORDERED** that the motion for compassionate release (DE 33) is DENIED. The clerk shall send a copy of this opinion and order to the defendant/petitioner, Mr. Suarez, by regular first-class mail.

/s/ Kevin McNulty

**KEVIN MCNULTY, U.S.D.J.**