UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| **UNITED STATES OF AMERICA**<br><br>v.<br><br>Joshua SUAREZ | Crim. No. 20-195 (KM)<br><br>**OPINION & ORDER** |

**MCNULTY, District Judge**

  On January 8, 2021, following defendant Joshua Suarez's plea of guilty to conspiracy to commit wire fraud, this Court sentenced him to 72 months' imprisonment and ordered him to pay $500,000 in restitution. He is currently serving that sentence at FCI Schuykill, with a projected release date of August 9, 2023. Now, Mr. Suarez seeks early release pursuant to the First Step Act, 18 U.S.C. § 3582(c)(1)(A), because the Third Circuit's recent holding in *United States v. Banks,* if applicable at the time of his sentencing, would have resulted in a lower Sentencing Guidelines offense level. For the reasons stated herein, that application is denied.

 **I.** **BACKGROUND**

  Mr. Suarez supervised a scheme to obtain money from financial institutions by assuming the identities of fraud victims. He entered into an agreement to plead guilty to a one-count information charging him with conspiracy to commit wire fraud, contrary to 18 U.S.C. § 1343, in violation of 18 U.S.C. § 1349. As part of his written plea agreement, he and the government agreed that the base offense level was 7, and that the "Specific Offense Characteristic U.S.S.G. § 2B1.1(b)(1)(I) applies because the relevant loss amount is more than $1,500,000 but not more than $3,500,000. This results in an increase of 16 levels." (DE 23 at 8 ¶ 5) That loss amount was based on the "intended loss," in keeping with U.S.S.G. § 2B1.1 application note 3(A) ("…

loss is the greater of actual loss or intended loss"). At sentencing on January 8, 2021, the Court calculated Mr. Suarez's sentencing guidelines offense level in accordance with that stipulation, and the parties agreed that this was correct. (Sentencing Tr. (DE 32) 5–6)[1]

In a subsequent panel decision, however, the U.S. Court of Appeals for the Third Circuit held that the "intended loss" definition in Application Note 3(A) exceeded the bounds of the Guideline, and hence was invalid. *United States v. Banks,* 55 F.4th 246 (3d Cir. Nov. 30, 2022). As a result, the Court held, an upward adjustment for loss must be calculated based on actual, not intended, loss.

It is undisputed that the actual loss in this case was approximately $500,000. The government appears to agree that if the *Banks* "actual loss" standard had been applied at sentencing, the upward adjustment would have been 12, not 16, points. The question, then, is whether the *Banks* decision, rendered some 22 months after entry of judgment, entitles Mr. Suarez to a reduction in sentence under the First Step Act.

## II. DISCUSSION

### a. Legal Standards

Once a term of imprisonment has been imposed, the Court may modify it only under very limited circumstances. *In re Morris*, 345 F. App'x 796, 797–98 (3d Cir. 2009) (citing 18 U.S.C. § 3582(c)). As relevant here, § 3582(c)(1) provides as follows:

> (A) the court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all

---

[1] The resulting agreed sentencing range was 70 to 87 months. Mr. Suarez did not file any appeal or application for collateral relief. Indeed, the plea agreement barred him from doing so if the sentence fell within the agreed range, which it did. (DE 23 at 9 ¶ 12) The prosecution, consistent with its approach in other cases before this Court, does not take the position that the waiver bars this application under the First Step Act. Indeed, this is Mr. Suarez's second First Step Act application. The first sought compassionate release based on the risk to Mr. Suarez's health if he should contract a COVID-19 infection while incarcerated. I denied that application in a written opinion and order. (DE 39)

2

> administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that--
>
>> (i) extraordinary and compelling reasons warrant such a reduction; [. . .]
>
>> and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission . . . .

*See also United States v. Pawlowski*, 967 F.3d 327, 329–30 (3d Cir. 2020). The United States Sentencing Commission has promulgated a policy statement that, in relevant part, allows a court to grant compassionate release or a sentence reduction where: (i) extraordinary and compelling reasons warrant a reduction in a defendant's sentence; (ii) the defendant is not a danger to the safety of others or to the community; and (iii) release from custody complies with the section 3553(a) factors, to the extent applicable. U.S. SENTENCING GUIDELINES MANUAL ("U.S.S.G.") § 1B1.13 (U.S. SENTENCING COMM'N 2018).

The Sentencing Commission issued a policy statement defining certain circumstances that qualify as extraordinary and compelling. U.S.S.G. § 1B1.13, Application Note 1(A)–(D).[2] While those grounds are not exclusive, they remain

---

[2]   Generally speaking, those enumerated circumstances include: (i) a terminal illness or a serious medical condition that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover; (ii) the defendant is at least 65 years old, is experiencing a serious deterioration in physical or mental health because of the aging process, and has served at least 10 years or 75 percent of his or her term of imprisonment, whichever is less; or (iii) certain family circumstances exist where the defendant would be the only available caregiver for his or her minor child, spouse, or registered partner. U.S.S.G. § 1B1.13, Application Note 1(A)–(C). In addition, the Sentencing Commission included a catchall provision, which provides that "other

a relevant and valuable guide, and are properly considered by a district court. *See United States v. Andrews*, 12 F.4th 255, 260 (3d Cir. 2021).

### b. Reduction based on subsequent judicial interpretation of Guidelines

I agree that a subsequent change in sentencing law, even if non-retroactive, should not be categorically ruled out of the First Step inquiry. *See United States v. Andrews*, 12 F.4th 255, 261–62 (3d Cir. 2021), *cert. denied*, 142 S. Ct. 1446 (2022). Still, I would not lightly find that Congress, when it passed the First Step Act, meant to silently undo the ordinary rules of retroactivity:

> "[I]n federal sentencing the ordinary practice is to apply new penalties to defendants not yet sentenced, while withholding that change from defendants already sentenced." *Dorsey v. United States*, 567 U.S. 260, 280, 132 S.Ct. 2321, 183 L.Ed.2d 250 (2012). "What the Supreme Court views as the 'ordinary practice' cannot also be an 'extraordinary and compelling reason' to deviate from that practice." *United States v. Wills*, 997 F.3d 685, 688 (6th Cir. 2021). Interpreting the First Step Act, we must "bear[ ] in mind the fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 320, 134 S.Ct. 2427, 189 L.Ed.2d 372 (2014) (internal quotation marks omitted) (quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133, 120 S.Ct. 1291, 146 L.Ed.2d 121 (2000)). And when interpreting statutes, we work to "fit, if possible, all parts" into a "harmonious whole." *Brown & Williamson*, 529 U.S. at 133, 120 S.Ct. 1291 (internal quotation marks omitted) (quoting *FTC v. Mandel Bros., Inc.*, 359 U.S. 385, 389, 79 S.Ct. 818, 3 L.Ed.2d 893 (1959)). Thus, we will not construe Congress's nonretroactivity directive as simultaneously creating an extraordinary and compelling reason for early release. Such an interpretation would sow conflict within the statute. *See United States v. Jarvis*, 999 F.3d 442, 444 (6th Cir. 2021) ("Why

---

reasons" may be sufficient if "[a]s determined by the Director of the [BOP], there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in [the enumerated] subdivisions." *Id.*, Application Note 1(D).

> would the same Congress that specifically decided to make these sentencing reductions non-retroactive in 2018 somehow mean to use a general sentencing statute from 1984 to unscramble that approach?").
>
> We join the Sixth and Seventh Circuits in reaching this conclusion. *See Jarvis*, 999 F.3d at 444–46; *Thacker*, 4 F.4th at 576; *see also United States v. Loggins*, 966 F.3d 891, 892–93 (8th Cir. 2020) (district court did not misstate the law in finding "that a non-retroactive change in law did not support a finding of extraordinary or compelling reasons for release"). *But see McGee*, 992 F.3d at 1048 (a nonretroactive change to mandatory minimums cannot, by itself, create extraordinary and compelling circumstances; but nonretroactive changes may be paired with other unique circumstances to create extraordinary and compelling reasons warranting a sentence reduction); *McCoy*, 981 F.3d at 286 (nonretroactive changes to mandatory minimums may create extraordinary and compelling circumstances). But in holding that the statutorily required sentence or Congress's nonretroactive sentencing reductions are not extraordinary and compelling reasons for purposes of § 3582(c)(1)(A), we are not saying that they are always irrelevant to the sentence-reduction inquiry. If a prisoner successfully shows extraordinary and compelling circumstances, the current sentencing landscape may be a legitimate consideration for courts at the next step of the analysis when they weigh the § 3553(a) factors. *See Jarvis*, 999 F.3d at 445; *Thacker*, 4 F.4th at 575–76.

*Andrews,* 12 F.4th at 261. Thus, under *Andrews,* a non-retroactive statutory reduction or abolition of a mandatory minimum sentence, while not extraordinary and compelling in its own right, may nevertheless be relevant to the next stage of the analysis, which requires the court to reweigh the § 3553(a) factors. *See* Section II.C, *infra.*

Some Courts of Appeals disagree, holding that the First Step Act's relaxation of statutory mandatory minimum sentences, though non-retroactive, may be considered as a factor at the gateway "extraordinary and compelling" stage of the analysis. *See United States v. Chen*, 48 F.4th 1092, 1097–98 (9th Cir. 2022) (joining the permissive approach of the First, Fourth and Tenth

5

Circuits, while noting its divergence from that of *Andrews,* as well as the Seventh and Eighth Circuits).

*Banks,* a novel interpretation of preexisting law, does not quite fit the mold of a subsequent statutory amendment. While its holding seems to imply that "actual loss" is and always was the law, its holding has not been judicially declared to be retroactive.[3] Nor would it meet the presumptive test of *Teague v. Lane,* 489 U.S. 289, 310 (1989). Nevertheless, the case law appears to be in flux, so, in an abundance of caution, I will not treat *Andrews* as an absolute bar to relief based on *Banks*. I nevertheless do not find the circumstances to be extraordinary and compelling.

To begin with, there is nothing extraordinary about applying the law as it stands at the time of sentencing; indeed, that is the "ordinary practice." (*See* authorities cited in quoted passage from *Andrews, supra.*) Ordinarily, a defendant must make a claim of error in order to benefit from it. Here, the defendant did not merely neglect to assert the "actual loss" test. He affirmatively stipulated to the contrary, and again affirmatively agreed with the Court's calculation at sentencing. In addition, he waived any appeal or § 2255 motion, provided the Court sentenced in the stipulated range. That stipulation, moreover, was part of a plea bargain in which the government agreed to forgo what was seemingly a readily provable charge of aggravated identity theft under 18 U.S.C. § 1028A, which would have entailed a mandatory consecutive two-year sentence.

The judgment in this case long ago became final. I will assume *arguendo* that, under the First Step Act, there may be extraordinary circumstances sufficient to overcome the usual interest in finality. A strong showing, for example, that the Court would have imposed a lower sentence if it had not been bound by a statutory mandatory minimum, later repealed, might present such a case. The method of calculating an upward adjustment to the offense

---

[3] The very different issue of "pipeline" retroactivity, *i.e.,* whether *Banks* applies to currently pending cases, is before the Court of Appeals. *See United States v. Upshur*, No. 21-3281 (3d Cir.).

level under the Guidelines, however, does not present a strong case for such treatment. *See generally Andrews,* 12 F.4th at 260–61 ("The duration of a lawfully imposed sentence does not create an extraordinary and compelling circumstance."). And it comes nowhere near the nonexclusive examples of extraordinary circumstances in the Guidelines. *See* p.3 & n.3, *supra.*

At sentencing, the Court did not simply adopt the parties' stipulated but nonbinding sentencing range. I specifically noted that, irrespective of any stipulation, I would select a sentence based on the 18 U.S.C. § 3553(a) factors:

> THE COURT: All right. Nevertheless, whether the defendant is authorized to argue for a variance or not, or a departure or not, I must discuss that aspect of the sentence, and the argument looks much the same whether the defendant is moving for it or not. And much of that will consist of the 3553 factors, of course.

(Sentencing Tr. (DE 32) at 6)

The Court's selection of sentence was not a mere mechanical application of the "intended loss" rule. I was aware of, and indeed focused on, the discrepancy between the actual loss and the Guidelines intended loss figure:

> THE COURT:  On that subject, just a quick question, Mr. Kogan. I noticed a rather large discrepancy between the amount of restitution and the amount of the loss. I assume that reflects the claims that have been submitted for restitution, or what?
>
> MR. [AUSA] KOGAN: Sure, Your Honor. What that reflects, part of this conspiracy was that Mr. Suarez and others would open up a bank account or another financial account. They, or others, would then impersonate someone else. . . .
>
> MR. KOGAN: John Doe. They impersonated John Doe or Jane Doe. They would contact John Doe or Jane Doe's bank account, bank or financial institution and cause moneys to be At times, that was successful and the money was transferred and defendant and his conspirators were able to obtain it. At other times, it was either stopped originally or it was able to be clawed back before it was disbursed. So the loss is the intended loss. The

7

restitution and forfeiture is the amount the defendant and the conspirators actually obtained.

 THE COURT: And that were claimed by the banks, I assume.

 MR. KOGAN: The banks and the financial institution, yes.

 THE COURT: Okay, all right. So there's two things: There's the amount that the banks claimed and there's the discrepancy between actual and attempted loss. Do I understand correctly?

 MR. KOGAN: Yes, Your Honor.

(Sentencing Tr. (DE 32) at 18)

I had that distinction firmly in mind when applying first § 3553 factor. There, I did not rely at all on the higher, intended loss figure. Rather, I focused on the defendant's managerial role, his exploitation of vulnerable underlings, and his retention of the lion's share of *actual* profits. (*Id.* at 20–21) In short, my view of the defendant's culpability was—and is—very far from being dependent on the intended-loss approach.[4]

The approach urged by Mr. Suarez here, if carried to its logical conclusion, might well render all subsequent legal developments retroactive. The "extraordinary and compelling" test, in this context, is designed to prevent such a result. There is no fundamental change in the law, and no great discrepancy between the sentence imposed and the one the Court would likely impose today, post-*Banks.* Under these non-extraordinary circumstances, there is no injustice in holding the defendant to the bargain he made and honoring the finality of the Court's judgment.

### c. § 3553(a) factors

The factors under 18 U.S.C. § 3553(a), if considered, would also weigh against an order of release. I have already discussed those factors in connection with Mr. Suarez's prior First Step Act application, and I incorporate

---

[4]  The Court might well consider an upward departure based on the intended loss in any event. Here, the intended loss, as I pointed out at the time, was more in the nature of attempted loss, defeated only by the banks' vigilance. The failure to realize the full dollar amount in no way reduces the defendant's culpability.

8

that discussion here.

In addition, I have discussed the initial, culpability-based § 3553 factor in the immediately preceding section of this Opinion. For the reasons expressed above, I do not find the intervening *Banks* holding extraordinary and compelling, and I also do not find that it greatly alters the § 3553 analysis.

It is true, of course, that Mr. Suarez has now served a greater percentage of his sentence, and his projected release date has been accelerated based on accumulation of good time and other factors.[5] His post-sentencing rehabilitation is already reflected in that reduction; moreover, the First Step Act cannot be used as a de facto parole system, or else it would threaten to terminate every sentence once most of it has been served.

The goals of punishment, deterrence, and protection of the public remain paramount, and the sentence reflects those concerns. I found at the time of sentencing that a 72-month sentence best comported with the goals of § 3553(a), whether or not the parties sought a variance or departure. I remain of the opinion that even if Mr. Suarez's circumstances were extraordinary and compelling, which is not the case, compassionate release should be denied because it would not be consistent with these other purposes of sentencing as set forth in 18 U.S.C. § 3553(a).

## ORDER

**IT IS THEREFORE** this 24th day of April, 2023,

**ORDERED** that the motion for compassionate release (DE 33) is DENIED. The clerk shall send a copy of this opinion and order to the defendant/petitioner, Mr. Suarez, by regular first-class mail.

/s/ Kevin McNulty

**KEVIN MCNULTY, U.S.D.J.**

---

[5] Mr. Suarez's projected release date, formerly July 24, 2024, is now August 9, 2023. *See* Federal inmate locator, https://www.bop.gov/inmateloc/ (inmate # 72558-050).